# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL., | § § § § § | |
| Plaintiff, | § § | |
| v. | § § | Case No.  3:13-cv-775 |
| PABLO M. ALVARADO, ET AL., | § § | |
| Defendants. | § § § | |

---

## RECEIVER'S ORIGINAL COMPLAINT

---

Ralph S. Janvey, in his capacity as the Court-appointed Receiver for the Stanford entities, files this Original Complaint, and alleges as follows:

### SUMMARY

1.     As this Court has already determined, Stanford International Bank, Ltd. and its many affiliated entities were used as tools to perpetrate a massive, worldwide fraud. The Stanford fraud, which touched three continents and lasted more than 20 years, could not have reached the size and scope that it did without the failure of Stanford's many directors and officers to fulfill their obligations as fiduciaries to act in the best interests of the Stanford entities and ultimately the creditors of those entities.  Many directors and officers simply looked the other way, while others actively assisted Stanford in defrauding thousands of people out of billions of dollars.  These directors and officers, who are the Defendants in this lawsuit, put their continued employment and substantial compensation ahead of the best interests of the entities they were hired to serve, ahead of their duty to ensure that the Stanford entities were operated

lawfully, and ahead of the victims of the Stanford fraud.  In doing so, they breached their fiduciary duties to the Stanford entities.  The Receiver files this lawsuit so that these Defendants may be held accountable for their wrongful actions and so that he may recover, on behalf of the Stanford victims and creditors, the benefits that these Defendants received as a result of their employment by the Stanford entities and damages for the harm that they caused.

## PARTIES

2.     Plaintiff Ralph S. Janvey has been appointed by this Court as the Receiver for the assets, monies, securities, properties, real and personal, tangible and intangible, of whatever kind and description, wherever located, and the legally recognized privileges (with regard to the entities) of Stanford International Bank, Ltd. ("SIB"), Stanford Group Company ("SGC"), Stanford Capital Management, LLC, R. Allen Stanford, James M. Davis, Laura Pendergest-Holt, and all the entities that the foregoing persons and entities own or control, including but not limited to Stanford Financial Group Global Management, LLC ("SFGGM"); Stanford Financial Group Company ("SFGC"); Stanford Trust Company ("STC"); Stanford Trust Company Ltd. (Antigua) ("STCL"); and the representative offices of Stanford Trust Company Ltd. (Antigua), d/b/a "Stanford Fiduciary Investor Services" ("SFIS").  The Receiver is asserting the claims contained herein in his capacity as Court-appointed Receiver.

3.     Defendant Pablo "Mauricio" Alvarado resides in Miami, Florida.  Alvarado will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

4.     Defendant Henry Amadio resides in Sugar Land, TX.  Amadio will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

5.      Defendant Daniel "Danny" Bogar resides in Hollywood, Florida.  Bogar will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

6.      Defendant Kennard "Kenny" Byron resides in Antigua.  Byron will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

7.      Defendant Jay Comeaux resides in Houston, Texas.  Comeaux will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

8.      Defendant Anthony D'Aniello resides in Houston, Texas.  D'Aniello will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

9.      Defendant Gordon Edwards resides in Houston, Texas.  Edwards will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

10.      Defendant Luis Garcia resides in Houston, Texas.  Garcia will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

11.      Defendant Jason Green resides in Baton Rouge, Louisiana.  Green will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

12.      Defendant Laura "Suzanne" Hamm resides in Germantown, Tennessee.  Hamm will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

13.      Defendant Rebecca Hamric resides in Houston, Texas.  Hamric will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

14. Defendant Mark Kuhrt is in the custody of the Bureau of Prisons. Kuhrt will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

15. Defendant Gilberto "Gil" Lopez is in the custody of the Bureau of Prisons. Lopez will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

16. Defendant Patricia Maldonado resides in Sugar Land, Texas. Maldonado will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

17. Defendant David Nanes resides in Miami, Florida. Nanes will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

18. Defendant Laura Pendergest-Holt is in the custody of the Bureau of Prisons. Pendergest-Holt will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

19. Defendant Osvaldo Pi resides in Miami, Florida. Pi will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

20. Defendant Nelson Ramirez resides in Hollywood, Florida. Ramirez will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

21. Defendant Robert "Glen" Rigby resides in League City, Texas. Rigby will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

22.     Defendant Jack Staley resides in Zurich, Switzerland.  Staley will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

23.     Defendant Linda Wingfield resides in Orlando, Florida.  Wingfield will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

24.     Defendant Robert Winter resides in Houston, Texas.   Winter will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

25.     Defendant Bernard "Bernie" Young resides in Fulshear, Texas.  Young will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

### JURISDICTION & VENUE

26.     This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and under Chapter 49 of Title 28, Judiciary and Judicial Procedure (28 U.S.C. § 754).

27.     Further, as the Court that appointed the Receiver, this Court has jurisdiction over any claim brought by the Receiver to execute his Receivership duties.

28.     Further, in accordance with 28 U.S.C. § 754, the Receiver filed the original SEC Complaint and the Order Appointing Receiver in all United States District Courts, giving this Court *in rem* and *in personam* jurisdiction in every district where the Complaint and Order have been filed.

29.     This Court has personal jurisdiction over the Defendants pursuant to FED. R. CIV. P. 4(k)(1)(c) and 28 U.S.C. §§ 754 and 1692.

## STATEMENT OF FACTS

30.     On February 17, 2009, the Securities and Exchange Commission filed a lawsuit in this Court against Allen Stanford, James Davis, Laura Pendergest-Holt, and three of Mr. Stanford's companies, Stanford International Bank, Ltd., Stanford Group Company, and Stanford Capital Management, LLC (collectively, the "Stanford Defendants").   On the same date, the Court entered an order appointing Ralph S. Janvey as Receiver over all of the property, assets, and records of the Stanford Defendants, including all of the entities that they own or control.

## I.     The Stanford Defendants operated the Stanford entities as a Ponzi scheme.

31.     The Stanford Defendants orchestrated and operated a wide-ranging Ponzi scheme. Stanford Defendant James "Jim" Davis has admitted that the Stanford fraud was a Ponzi scheme from the beginning.  (*See* Davis Plea Agreement, Case No. 3:09-CV-0298-N, Doc. 771 at ¶ 17(n) (Stanford, Davis, and other conspirators created a "massive Ponzi scheme"); Davis Tr. of Rearraignment, Case No. 3:09-CV-0298-N, Doc. 807 at 16:16–17, 21:6–8, 21:15–17 (admitting that Stanford Ponzi fraud was a "massive Ponzi scheme ab initio").)

32.     This Court has found that the Stanford entities were operated as a Ponzi scheme. (*See* Case No. 3:09-CV-724-N, Doc. 909 at 16–17 ("This Court has repeatedly held that Stanford operated a Ponzi scheme. . . .  Here, the Court again holds that, as a matter of law, Stanford operated a Ponzi scheme."); Case No. 3:09-CV-0721-N, Doc. 176 at 19 n.23 ("[T]he Court here clarifies that it holds that Stanford operated a Ponzi scheme."); Case No. 3:09-CV-0724-N, Doc. 456 at 2 ("The Stanford scheme operated as a classic Ponzi scheme, paying dividends to early investors with funds brought in from later investors."), at 11 ("[T]he Receiver presents ample evidence that the Stanford scheme . . . was a Ponzi scheme."), at 13 ("The Court finds that the Stanford enterprise operated as a Ponzi scheme . . . .").)

33.     The Fifth Circuit has upheld this Court's finding that the Stanford entities were operated as a Ponzi scheme.   *See Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2010). In particular, the Fifth Circuit made several rulings on the nature of the Stanford fraud, as follows:

> We find that the district court did not err in finding that the Stanford enterprise operated as a Ponzi scheme.
>
> . . . .
>
> The Davis Plea and the Van Tassel Declarations provide sufficient evidence to support a conclusion that there is a substantial likelihood of success on the merits that the Stanford enterprise operated as a Ponzi scheme. . . . The Davis Plea, when read as a whole, provides sufficient evidence for the district court to assume that the Stanford enterprise constituted a Ponzi scheme *ab initio*.
>
> . . . .
>
> The Receiver carried his burden of proving that he is likely to succeed in his prima facie case by providing sufficient evidence that a Ponzi scheme existed . . . .
>
> . . . .
>
> Here, the Receiver provided evidence of a massive Ponzi scheme . . . .
>
> . . . .
>
> The record supports the fact that Stanford, when it entered receivership, was grossly undercapitalized.

*Id.* at 597, 599, 601.

34.     This Court has held that all of the Stanford entities, including SIB, were operated as one for the purposes of perpetrating a massive, worldwide fraud:

> The Receiver has shown that Stanford operated the entire network of Stanford Entities as an integrated unit in order to perpetrate a massive worldwide fraud. Each Stanford Entity either participated in the scheme, derived benefit from the scheme, or lent the appearance of legitimacy to the entirety of Stanford's fraudulent enterprise. To ignore these findings would elevate form over

substance – thereby legitimizing the corporate structure that Stanford utilized to perpetrate his fraud and running afoul of Fifth Circuit precedent cautioning courts to look beyond the surface. Thus, because SIB did not observe corporate formalities and because all the Stanford entities were "operated as one for purposes of perpetrating a fraud on investors," the Court pierces SIB's corporate veil and aggregates the Stanford Entities.

(*See* Case No. 3:09-CV-00721-N, Doc. 176 at 36, 50 (internal citation omitted); *see also* Case No. 3:09-CV-0724-N, Doc. 909 at 8–9.)

35.     In marketing, selling, and issuing SIB CDs to investors, the Stanford Defendants repeatedly touted the SIB CDs' safety and security and SIB's consistent, double-digit returns on its investment portfolio.  (*See* SEC's Second Amended Complaint, Case No. 3:09-CV-0298-N, Doc. 952 at ¶¶ 32–33.)

36.     In its brochure marketing the SIB CD, SIB told investors, under the heading "Depositor Security," that its investment philosophy is "anchored in time-proven conservative criteria, promoting stability in [SIB's] certificate of deposit."  SIB also emphasized that its "prudent approach and methodology translate into deposit security for our customers."  (*See id*. at ¶ 34.)  Further, SIB stressed the importance of investing in "marketable" securities, saying that "maintaining the highest degree of liquidity" was a "protective factor for our depositors."  (*See id*.)

37.     In its 2006 and 2007 Annual Reports, SIB told investors that SIB's assets were invested in a "well-balanced global portfolio of marketable financial instruments, namely U.S. and international securities and fiduciary placements."  (*See id*. at ¶ 35.)  More specifically, SIB represented that its 2007 portfolio allocation was 58.6% equity, 18.6% fixed income, 7.2% precious metals, and 15.6% alternative investments.  (*See id*.)

38.     Consistent with its Annual Reports and brochures, SIB trained SGC financial advisors, in February 2008, that "liquidity/marketability of SIB's invested assets" was the "most

important factor to provide security to SIB clients." (*See id.* at ¶ 36.)  In training materials, the Stanford Defendants also claimed that SIB had earned consistently high returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993). (*See id.* at ¶ 49.)

39.     Contrary to SIB's representations regarding the liquidity of its investment portfolio, SIB did not invest in a "well-diversified portfolio of highly marketable securities." Instead, significant portions of SIB's portfolio were misappropriated by the Stanford Defendants and were either placed in speculative investments (many of them illiquid, such as private equity deals), diverted to other Stanford entities "on behalf of shareholder" (*i.e.*, for the benefit of Allen Stanford), or used to finance Allen Stanford's lavish lifestyle (*e.g.*, jet planes, a yacht, other pleasure craft, luxury cars, homes, travel, company credit cards, etc.).  In fact, at year-end 2008, the largest segments of SIB's investment portfolio were in speculative and illiquid private equity, over-valued real estate, and at least $1.8 billion in undocumented "loans" to Allen Stanford.

40.     For example, Stanford records assigned a value of $3.174 billion to the real estate holdings in SIB's investment portfolio.  However, those same records listed only two assets in this category—real estate holding companies that owned two properties in Antigua.  These two properties were purchased (via the purchase of their holding companies) in 2008 for a total of $63.5 million.  The unsupported 5,000% inflation to the assigned value of these assets in a 4 to 6-month period was a result of Allen Stanford and Jim Davis's plan to effect a series of paper transactions intended to increase the value of SIB's real estate holdings on its balance sheet, even though there was no basis for any increase in the value of those holdings during that period.

41.     In an effort to conceal their fraud and ensure that investors continued to purchase SIB CDs, the Stanford Defendants fabricated the performance of SIB's investment portfolio. (*See id.* at ¶ 4.)  SIB's financial statements, including its investment income, were fictional.

(*See id.* at ¶¶ 4, 53.)   In calculating SIB's investment income, Allen Stanford and Jim Davis provided to SIB's internal accountants, Defendants Gil Lopez and Mark Kuhrt, a pre-determined return on investment for SIB's portfolio.  (*See id.*)   Using this pre-determined rate of return, SIB's accountants reverse-engineered SIB's financial statements to reflect investment income that SIB did not actually earn.  (*See id.*)

42.     For a time, the Stanford Defendants were able to keep the fraud going by using funds from current sales of SIB CDs to make interest and redemption payments on pre-existing SIB CDs.  (*See id.* at ¶ 1.)  However, in late 2008 and early 2009, SIB CD redemptions increased to the point that new SIB CD sales were inadequate to cover redemptions and normal operating expenses.  As the depletion of liquid assets accelerated, the Stanford Ponzi scheme collapsed.

## II.     There were numerous "red flags" indicating that the Stanford entities were being operated as a massive fraud.

43.     SIB's investment returns were too good to be true.  SIB offered CD rates that were significantly higher than the rates that were being offered by U.S. banks.  In its own marketing brochure, SIB included the following comparison between SIB CDs and U.S. bank CDs from 1997 to 2006:

|                | 1997  | 1998 | 1999 | 2000  | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|----------------|-------|------|------|-------|------|------|------|------|------|------|
| SIB Yield (%)  | 10.13 | 9.25 | 8.71 | 9.625 | 9.13 | 7.17 | 6.38 | 6.21 | 6.52 | 7.13 |
| U.S. Yield (%) | 5.8   | 5.3  | 4.9  | 5.85  | 3.55 | 1.85 | 1.78 | 2.7  | 4.46 | 5.08 |

44.     At their worst, SIB CDs provided a rate of return that was 140% greater than the average rate for U.S. bank CDs.  At their best, SIB CDs provided a rate of return that was 388% greater than the average rate for U.S. bank CDs.

45.     Even more incredible were the overall rates of return earned by SIB's investment portfolio between 1997 and 2007—*i.e.* the total amount purportedly earned by SIB by investing

SIB CD proceeds, not just the amount paid to investors.  SIB reported high rates of return and consistent profitability of its investment portfolio, even when the world economy was in crisis. Specifically, according to internal company documents, the SIB investment portfolio had a 14.9% overall rate of return in 1997, 14.8% in 1998, 14.2% in 1999, 14.1% in 2000, 14.3% in 2001, 14% in 2002, 11.7% in 2003, 11.9% in 2004, 12.1% in 2005, 12% in 2006 and 12.7% in 2007.  These internal documents were part of the training materials that were used to train Stanford financial advisors to sell the SIB CDs.

46.    A comparison of SIB's claimed overall rate of return on its investment portfolio to well known index rates of return during the same years further highlights the disparity in performance between the SIB investment portfolio and the world financial markets during that time period.  Over the years, the performance of the SIB investment portfolio often exceeded many of the well-known index rates of return.  Even when it did not, the purported returns on the SIB investment portfolio were remarkably consistent and steady from year to year—a result that is extremely rare in normal market conditions and even more so during the time period in question.  The chart below shows major index returns from 1997 to 2007, as well as the returns allegedly earned by SIB during those years (all as reflected in SIB's own documents):

|  | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SIB Yield (%) | 14.9 | 14.8 | 14.2 | 14.1 | 14.3 | 14 | 11.7 | 11.9 | 12.1 | 12 | 12.7 |
| Dow Jones Return | 22.64 | 16.10 | 25.22 | -6.18 | -7.10 | -16.76 | 25.32 | 3.15 | -0.61 | 16.29 | 6.43 |
| Dow Jones Stoxx 50 Return | 36.84 | 32.00 | 46.74 | -2.69 | -20.25 | -37.30 | 15.68 | 6.90 | 21.28 | 15.12 | 6.79 |
| Nasdaq 100 Return | 20.63 | 85.31 | 101.95 | -36.84 | -32.65 | -37.58 | 49.12 | 10.44 | 1.49 | 6.79 | 18.67 |

| S&P 500 Return | 31.01 | 26.67 | 19.53 | -10.14 | -13.04 | -23.37 | 26.38 | 8.99 | 3.00 | 13.62 | 3.53 |
|---|---|---|---|---|---|---|---|---|---|---|---|

47.    SIB's commission rate structure was also too good to be true.  In fact, it was economically unsustainable.  SGC financial advisors were paid far above normal market commission rates to sell the SIB CDs.  SGC received a 3% commission (also called a "referral fee") on the initial sale of a SIB CD and 3% annually for the life of the CD.  Financial advisors, in turn, received as much as an annual 1% commission on all amounts that their customers had invested in SIB CDs for that year and were eligible for commissions on the initial sale of CDs of 1% or more.  As the SEC pointed out in a September 2005 letter to Jay Comeaux as part of an SEC investigation, this commission structure would result in SGC receiving a referral fee of 15% of the amount invested in a SIB CD with a 60-month maturity, which the SEC said was more than any rate legally allowed.  SGC financial statements referred to this letter in 2005, 2006, and 2007.  By comparison, when SGC brokers sold U.S. bank CDs, the commission to SGC was in the range of 0.05% to 0.125% of the initial amount invested—roughly 150 times smaller than the commission SGC received on SIB CDs.

48.    The SIB CD commission structure for financial advisors was unusual in other ways.  Each year, Stanford financial advisors received a percentage of the total amount that their clients held in SIB CDs, regardless of whether the financial advisor sold any new SIB CDs that year.  This "trailing commission" incentivized financial advisors to pressure customers into not redeeming their SIB CDs—*i.e.* into leaving their money invested in SIB.  Commission and bonus structures like that used by SIB are not typical, largely because they cannot be sustained economically—*i.e.* the investments made with proceeds from the sale of the CD do not cover the stated CD rate of return, commissions, referral fees, and other applicable expenses.

49. The information available to the Defendants regarding SIB's investment portfolio was inadequate. The NASD concluded as early as 2006 that SGC violated NASD rules through "unwarranted and misleading" assertions that SIB's investments were "prudent" at a time when SGC admitted that "no one at SGC knows what the investments are."

50. As reported in SIB's annual statements, SIB's auditing firm was C.A.S. Hewlett & Co., Ltd. The Hewlett firm—a small, local firm located in Antigua—lacked the apparent resources, credentials, reputation, and staff to audit a multi-billion dollar investment portfolio. SIB used the Hewlett firm even though at least two of the Big 4 audit firms and several other international firms had a presence in Antigua and all of the Big 4 had locations in the Caribbean. Although various financial advisors called for the use of a large, reputable audit firm to calm concerns raised by individual clients, SIB continued to use the Hewlett firm until the very end.

51. The flow of funds between SIB and the other Stanford entities was also unusual. In its 2007 Annual Report, SIB told investors that "our sole shareholder reinvests every dollar earned back into retained earnings; an act of foresight that has continuously strengthened our capital base for future growth. And that's why we are able to pay consistent returns to our clients, year after year, through market ups and market downs." In "talking points" that were prepared in response to questions from clients who were concerned about the negative publicity surrounding SIB and the SIB CDs, Stanford personnel represented that "[e]very single dollar earned is reinvested back into the Bank's retained earnings, which continuously strengthens its capital base for continued growth." Because SIB was actually propping up the other Stanford entities through substantial capital infusions, these statements were indisputably false.

52. SIB had a long history of regulatory scrutiny. In 1997, various departments within the SEC found that the Stanford entities were being operated as a Ponzi scheme. These

findings were based on, among other things, examinations in which the SEC found that: (1) SIB advertised consistent and significantly-above-market rates of return to CD holders; (2) SIB paid SGC, and SGC in turn paid its financial advisors, commissions that were significantly above market rates; (3) SIB's reported investment returns were consistent in volatile markets and were higher than those that would be likely from the type of "safe" investments described to investors; and (4) SGC and its financial advisors neither maintained nor had access to sufficient information regarding the SIB CDs or SIB's investment portfolio.  In 1998, the SEC conducted another examination of SGC.  The examiner who conducted the examination has testified that SGC's complete lack of information regarding the SIB CDs it was selling amounted to fraud.

53.     In 2004, the SEC conducted yet another examination of SGC and, in the resulting report, concluded that:  (1)  "the offering of the SIB CDs may in fact be a very large ponzi scheme, designed and marketed by SIB's and SGC's [sic] to lull investors into a false sense of security by their claims that the SIB products are similar to traditional U.S. bank CDs;" (2) SGC was a high regulatory risk with regard to sales practice issues; (3) "little, if any of the funds invested into the SIB CDs may actually be invested as represented to investors;" (4) SGC failed or refused to produce documents showing how the proceeds from the sale of SIB CDs were invested; (5) SGC's regulatory violations included making misrepresentations and omissions to customers, charging excessive commissions, and failing to disclose the amount of commissions charged; and (6) the following factors supported the conclusion that the SIB CDs were a fraud— excessive commissions, aggressive sales contests, high "interest" rates, high returns every year for the last 10 years, SIB will not disclose its portfolio, and other factors leading the SEC to believe that Allen Stanford may have been engaging in money laundering and using investor funds without any oversight.

54. In 2005, the SEC concluded that SGC's SIB CD marketing materials falsely "imply little or no risk to the investor" and that those marketing materials were "materially misleading as they inaccurately imply a safety of principal and the guaranteed receipt of interest of the principal." In connection with that same inquiry, the SEC sent a detailed questionnaire to a number of SIB CD investors, clearly signaling concerns about the SIB CDs, the makeup of SIB's investment portfolio, and misrepresentations that customer deposits were guaranteed or protected by insurance. Questions on the questionnaire included:

- "Did anyone tell you where Stanford was going to invest your funds in order to generate returns for CD Program Investors?"

- "Did anyone tell you that funds invested in the CD Program were insured against loss?"

- "Did anyone guarantee the return of your principal investment?"

- "Please describe in full what you were told, if anything, about the risk of this investment."

Notice of this questionnaire was sent to *all* SGC financial advisors in May 2005.

55. In February 2007, a prospective SIB client commissioned an analysis of the SIB CD product, which he then sent to his Stanford financial advisor (the "2007 Investor Analysis"). The analysis essentially concluded that SIB was a Ponzi scheme. It found that SIB was "susceptible to a dependence on new deposits and renewed certificates in order to continue paying investors the guaranteed CD interest and the principal of maturing CDs" because only a small drop in the equities markets would likely render its assets insufficient to meet its liabilities. The 2007 Investor Analysis was circulated among several high-level Stanford employees, including Defendants Jason Green, Glen Rigby, Suzanne Hamm, and Bernie Young. None of the individuals who reviewed the 2007 Investor Analysis took any meaningful action in response to the serious allegations contained therein.

56.     In July 2008, Bloomberg published an article stating that the SEC was "investigating sales of certificates of deposit by Stanford Group Company at its offshore bank, which has $6 billion in assets in Antigua" (the "Bloomberg Article") and that the SEC had issued subpoenas to two former SGC financial advisors—Charles Rawl and Mark Tidwell—both of whom were allegedly forced to resign in 2007 because they refused to participate in SGC's "illegal and unethical" marketing methods.   Among other things, the SEC subpoenas sought information about the sale of SIB CDs and requested copies of training materials on SIB CD sales methods. The Bloomberg Article prompted much discussion among both Stanford personnel and SIB CD investors.   It also led several investors to withdraw their funds from SIB.

### III.     The Defendants were directors and officers of the Stanford entities.

57.     As noted above, this Court has held that each Stanford entity either participated in the scheme, derived benefit from the scheme, or lent the appearance of legitimacy to the entirety of Stanford's fraudulent enterprise.   (*See* No. Case 3:09-CV-00721-N, Doc. 176 at 36.)   Each of the Defendants owed a fiduciary duty to place the interest of operating the Stanford entities in a lawful manner above their own interest in being highly-compensated Stanford insiders, including by using reasonable care in operating and managing the Stanford entities, by operating the Stanford entities in a reasonably prudent manner, and by operating the Stanford entities in compliance with all applicable laws and regulations.   In failing to do so, the Defendants breached their fiduciary duties to the Stanford entities.

58.     Based on the Defendants' respective positions, knowledge, and access to relevant information, including based on the facts set forth below, they either knew or should have known that the Stanford entities were not profit-making enterprises, that the Stanford entities were being

propped up by proceeds from the sale of SIB CDs, and that the Stanford entities were being operated by the Stanford Defendants as a massive fraud.[1]

## A.    Mauricio Alvarado

59.    Alvarado was formerly General Counsel and head of the legal department of the worldwide Stanford operations with its headquarters in Houston, Texas and operations in the United States, Latin America, Europe and the Caribbean.  As General Counsel, Alvarado became intimately familiar with the operations and the financial condition of the Stanford entities.  He was also aware that the proceeds from the sale of SIB CDs flowed into SIB's bank accounts and were then used to pay the operating expenses of the other Stanford entities.  Alvarado worked very closely with Allen Stanford and other high-level Stanford personnel to oversee the legal operations of all the Stanford entities.

60.    Alvarado was aware of the SEC's investigation into the SIB CDs in 2005.  Numerous  financial advisors communicated with Alvarado regarding questions and comments they had received from concerned clients in connection with the SEC's inquiries.

61.    In 2005, Alvarado learned that the sale of SIB CDs in Ecuador had been suspended by Ecuadorian authorities for violating Ecuadorian law, and he worked with outside counsel to respond to the "Ecuador situation."  Alvarado received a number of e-mails from financial advisors who had been contacted by clients that were concerned about the soundness of their investments.

62.    Alvarado also worked in concert with Allen Stanford to draft a misleading letter on the letterhead of Leroy King of FSRC (the Antiguan governmental entity ostensibly responsible for regulating SIB) in response to an SEC inquiry to the FSRC.  Alvarado understood

---

[1]    The facts outlined herein are not intended to be an exhaustive recitation of the facts establishing the Defendants' culpability.  Further, the Receiver continues to uncover relevant facts as a result of his ongoing investigation of Stanford's massive fraud.

at the time that the FSRC would not disclose his or other Stanford personnel's involvement in preparing the response to this SEC inquiry.

63.     Alvarado was also among the first to be informed of the Bloomberg Article. Before it was published, Alvarado worked closely with other high-level Stanford officials to prepare misleading responses to a number of claims regarding the SEC's investigation into the SIB CDs.

**B.     Henry Amadio**

64.     Amadio served as Accounting Manager for SFGC.  He was employed by the Stanford entities from 2002 to 2009.  Amadio's duties at SFGC included drafting a regular "shareholder funding report" detailing how various Stanford entities were funded by loans from SIB to Allen Stanford.  At Allen Stanford's criminal trial, Amadio testified that he knew "as early as 2005" that Allen Stanford was misappropriating proceeds from the sale of SIB CDs for his personal use and to finance other Stanford entities.  Amadio also testified that he knew SIB's 2007 Annual Report contained false information while he was involved in drafting it. In particular, Amadio testified that he knew the report's statement that "SIB does not expose its clients to risks associated with commercial loans" was inaccurate and that he was concerned that the loans being made to fund the other Stanford entities would not be repaid.

**C.     Danny Bogar**

65.     Bogar served as the CEO and President of SGC.  He was employed by the Stanford entities from 2004 to 2009.  Bogar had additional roles with other Stanford entities, including: Managing Director and member of the Board of Directors of Stanford Group Holdings, Ltd.; Director of Stanford Capital Management, LLC; and Director of Stanford Trust Company.

66.     Bogar was closely involved in the operations of the Stanford entities.  In late 2007 or early 2008, Bogar was named the regional director for the Stanford entities' North American operations.  Among other things, he worked closely with Jim Davis in developing plans to restructure, reorganize, and consolidate the Stanford entities' operations.  Bogar also knew of and participated in moving capital and investments between the Stanford entities.  He worked closely with Davis and with the other regional directors in creating and coordinating regional and global budgets for the Stanford entities.

67.     Bogar also worked closely with SGC's clearing agent, whose credit risk analyst expressed discomfort with Stanford's business model and encouraged Bogar to retain a Big 4 accounting firm to verify the audits performed by the Hewlett firm in Antigua.  In July 2008, Bogar learned that the State of Florida Office of Financial Regulation was investigating SIB.  Nevertheless, Bogar worked with Allen Stanford, Jim Davis, Laura Pendergest-Holt, Juan Rodriguez-Tolentino and Jason Green to develop misleading talking points aimed at reassuring concerned clients.  In mid-January 2009, Davis informed Bogar that SIB's private equity portfolio differed from past representations.  In early-February 2009, Bogar attended the private meetings in Miami, Florida, where the inaccuracies in SIB's financial statements were revealed.

**D.     Jay Comeaux**

68.     Comeaux served as President and Executive Director of SGC.  He was employed by the Stanford Entities from 1996 to 2009.  Comeaux had additional roles with other Stanford entities, including: Director of Stanford Trust Company; Director of Stanford Bank Holdings Ltd.; Director of Stanford International Bank Holdings Limited; Director of Stanford Trust Holdings Ltd.

69.     In his position as President and Executive Director of SGC, Comeaux was responsible for the overall supervision of the financial advisors who actually recommended and

sold the SIB CDs.  Comeaux also recommended and sold SIB CDs to investors.  Although SIB did not disclose the details of its investment holdings to SGC executives, including Comeaux, Comeaux made representations to investors concerning SIB's investment portfolio and knew that SGC financial advisors were trained to do the same.

70.     In 2005, the SEC contacted Comeaux directly to inquire about the SIB CDs and SIB's investment portfolio.  During this same time period, Comeaux received several reports from financial advisors that their clients were expressing concerns about their investments as a result of having been contacted by the SEC regarding SIB and the SIB CD.  In 2008, Comeaux discussed the Bloomberg Article with several financial advisors.  In January 2009, Comeaux was told by another financial advisor that a former Stanford employee had told a local CPA that SIB was a fraud.  Nevertheless, Comeaux continued to recommend and sell SIB CDs to clients and continued to supervise other financial advisors who were doing the same.

**E.     Anthony D'Aniello, Gordon Edwards, and Kenny Byron**

71.     D'Aniello served as President and Director of STCL from 2003 to 2008.  Under the direction of Allen Stanford, D'Aniello was responsible for setting STCL's financial goals and business strategy.  D'Aniello expanded STCL's reach by opening representative offices in Columbia.  Upon leaving STCL, D'Aniello agreed to serve on Stanford's International Advisory Board.

72.     Edwards served as Treasurer of STCL from 2001 to 2007.  He was employed by the Stanford entities from 1998 to 2007.  Edwards was actively involved in the management of STCL trusts that were invested in SIB CDs.

73.     Byron served as Director of STCL from 2003 to 2008.  He was employed by the Stanford entities from 1999 to 2008.  Byron also served as Managing Director and as member of the Board of Directors of Bank of Antigua Limited.

74.     STCL received referral fees from SIB in exchange for investing trust assets in SIB CDs.  Because these fees from SIB constituted STCL's primary source of revenue, D'Aniello, Edwards, and Byron were particularly familiar with SIB's operations, including with respect to its role in supporting the other Stanford entities.

**F.     Luis Garcia**

75.     Garcia served as SFGC's Director of Internal Audit from 2006 to 2009.  He reported directly to Jim Davis.  By agreement between SFGC and SIB, SFGC provided internal audit services to SIB.  Garcia prepared quarterly audit reports for SIB, which he sent directly to Allen Stanford.  Garcia performed these audits through at least October 2008.  Garcia knew that the internal audit services he was providing to SIB were inadequate because they did not include a real audit of SIB's investment portfolio.

76.     In late 2007 and early 2008, Garcia served on Stanford's Governance Committee—an ad hoc committee set up by Allen Stanford, Jim Davis, and others to improve the Stanford entities' operations and management structure.

77.     Garcia resigned from his position as Director of Internal Audit a week before the Receiver was appointed.

**G.     Jason Green**

78.     Green served in several capacities at SGC from 1996 to 2009, including as the Producing Branch Manager of the Baton Rouge, Louisiana office, as the President of the U.S. Private Client Group at SGC, and as a financial advisor.  Green had additional roles with other Stanford entities, including: Director of Stanford Trust Company and Director of Stanford Family Office, LLC.

79.     In his capacity as President of the Private Client Group, Green was well-informed about SIB's financial condition.  Green was responsible for the weekly and monthly reports

about SIB that were distributed to Stanford's managing directors and financial advisors, and was regularly consulted by the managing directors and financial advisors about SIB's operations. Along with Bernie Young, SFGC's Managing Director and Chief Compliance Officer, Green trained Stanford financial advisors on how to sell SIB CDs.

80.     In addition to his expertise regarding SIB's financial condition and operations, Green was aware of concerns that had been raised externally about SIB's solvency and the Stanford scheme.  For example, Green forwarded the 2007 Investor Analysis to other Stanford personnel, including Suzanne Hamm and Bernie Young, and noted that it was "another one." In 2008, Green received another report prepared by a prospective client's CPA, questioning SIB's financial performance.

81.     Green was also aware of regulators' concerns.  After Bloomberg reported in July 2008 that the SEC was investigating SIB and the other Stanford entities, Green reassured managing directors and financial advisors that were concerned about the article.  In September 2008, Green learned that the State of Florida Office of Financial Regulation was investigating SIB and questioning investors.  Green communicated directly with Allen Stanford and Jim Davis about that investigation.

82.     Green also helped formulate misleading statements to the public and to Stanford employees and investors about SIB and the SIB CDs.  In 2008, Green worked closely with others, including Allen Stanford, Jim Davis, Laura Pendergest-Holt, and Juan Rodriguez-Tolentino, to draft talking points to distribute to concerned SIB clients.  In 2009, Green continued to work on Stanford's public relations matters, including working with Suzanne Hamm to prepare responses to negative press regarding the Stanford entities.

### H.     Suzanne Hamm

83.     Hamm served as Chief Marketing Officer/North America for SFGC and was employed by the Stanford entities from 2005 to 2009.  Throughout her tenure, Hamm was frequently involved in preparing talking points for responding to questions from clients regarding the negative publicity surrounding SIB and the SIB CDs.

84.     In November 2006, Hamm assisted in drafting standard responses to be used by financial advisors in communications with clients regarding the negative publicity surrounding the SIB CDs.  In February 2007, Hamm worked with an outside PR consultant to develop a comprehensive list of talking points that financial advisors could use in responding to client questions.  In November 2007, Hamm provided a financial advisor with talking points after the financial advisor asked for help in responding to a prospective client who had heard rumors "about Stanford's 'shady' off-shore practices."

85.     Hamm reviewed the 2007 Investor Analysis discussed above and was closely involved in preparing a response.  Hamm was also involved in crafting a response to the Bloomberg Article.  In September 2008, Hamm sent talking points to a financial advisor whose client was asking about the Bloomberg Article.

### I.     Rebecca Hamric

86.     Hamric served as a corporate attorney for SFGC from 1999 to 2009.  Hamric provided legal services to many of the Stanford entities, including preparing state and federal securities filings (such as registration statements and SEC Form Ds); drafting the subscription agreements signed by SIB CD investors; drafting various agreements between the Stanford entities (such as the consulting agreement between SIB and SGC, the referral agreement between SIB and STC, and various agreements between SIB and its international affiliates); advising

about the contents of disclosure statements, brochures, and other CD marketing materials; and responding to inquiries from regulators (such as NASD, FINRA, and the SEC).

87.     In performing these responsibilities, Hamric became intimately familiar with SIB's operations and financial condition.   For example, in response to the NASD's 2006 investigation into SGC's SIB CD sales, Hamric drafted a letter asserting that SGC had adequately disclosed the risks of investing in SIB CDs and that the SIB CD qualified as a prudent investment.

**J.      Gilberto "Gil" Lopez and Mark Kuhrt**

88.     Lopez served as Chief Accounting Officer for SFGC.   Kuhrt served as Global Controller for SFGGM.   They were both employed by the Stanford entities from 1997 to 2009. Lopez and Kuhrt provided accounting services to several Stanford entities, including SIB, SFGC, and SFGGM.   Neither Lopez nor Kuhrt is a CPA.

89.     Lopez and Kuhrt are named defendants in the SEC's civil action against the Stanford Defendants.   According to the SEC's Second Amended Complaint, Lopez and Kuhrt were well aware of the undocumented "loans" to Allen Stanford.   (*See* SEC's Second Amended Complaint, Case No. 3:09-CV-0298-N, Doc. 952 at ¶ 42.)   The personal "loans" to Stanford were inconsistent with representations that had been made to SIB investors.   (*See id.* at   ¶ 46.) For example, SIB's annual reports included a section entitled "Related-Party Transactions," which purported to disclose all related-party transactions entered into by SIB.   (*See id.*)   SIB's "loans" to Allen Stanford were not disclosed in that section, in SIB's quarterly reports to the FSRC, or anywhere else.   (*See id.*)   With full knowledge that these "loans" existed, Lopez and Kuhrt were involved in preparing, reviewing, and authorizing the filing and dissemination of these false and misleading reports.   (*See id.*)

90.     The SEC has also alleged that Lopez and Kuhrt falsified SIB's financial statements, including by fabricating the growth, composition, and performance of SIB's investment portfolio to give the appearance that SIB's investments were highly profitable. (*See id.* at ¶ 48.)  In calculating SIB's investment income, Allen Stanford and Jim Davis would provide Lopez and Kuhrt with a pre-determined return on investment for SIB's portfolio, and Lopez and Kuhrt would reverse-engineer SIB's financial statements to reflect investment income that SIB did not actually earn.  (*See id.* at ¶ 53.)  After calculating the fictional investment income and asset growth necessary to support the pre-determined return, Lopez and Kuhrt would falsify SIB's accounting entries accordingly.  (*See id.*)  In doing so, Lopez and Kuhrt caused SIB to report investment income that it did not actually earn and thus greatly inflated the value of its investment portfolio.  (*See id.* at ¶ 54.)

91.     Both Lopez and Kuhrt have been convicted for their involvement in the Stanford Ponzi scheme.  Both have been sentenced to 240 months in prison.

**K.     Patricia Maldonado**

92.     Maldonado served as the Treasury Manager and Assistant Secretary for SFGC. She was employed by the Stanford entities from 1995 to 2009.  Maldonado had additional roles with other Stanford entities, including: Director of Stanford International Management, Ltd.; Director of Stanford Management Holdings, Ltd.; Treasurer and Director of Stanford Corporate Holdings International, Inc.; and Assistant Secretary of Stanford Financial Group Limited (IBC).

93.     Maldonado served as Treasury Manager for the final eight years of her tenure. In her position as Treasury Manager, Maldonado reported directly to Jim Davis and oversaw the accounts of all the Stanford entities.  Her responsibilities included cash management, global cash reporting, approving transactions, opening accounts, managing banking relationships, and signing checks.

94.     Maldonado knew how funds flowed between the Stanford entities.  In particular, Maldonado was aware that the proceeds of SIB CD sales flowed into SIB's bank accounts and that they were then used to pay the operating expenses of the other Stanford entities.  Maldonado and her subordinates prepared periodic reports for Allen Stanford and Jim Davis detailing the cash flows and balances in SIB's bank accounts.

95.     Maldonado learned of the Bloomberg Article in July 2008, but, according to her own admission, did nothing to investigate the validity of the allegations made by Rawl and Tidwell.  In early-February 2009, Maldonado learned of articles in VenEconomy Monthly and Businessweek suggesting that the SIB CDs were fraudulent.

96.     Despite these red flags, on February 17, 2009, Maldonado transferred approximately $12 million from a SIB account at Trustmark National Bank to a SIB account at Toronto Dominion Bank.  Later that same day, the Receiver took control of SFGC and halted further transfers.

**L.     David Nanes**

97.     Nanes was President of Stanford Group Mexico, S.A. de C.V. and Stanford Fondos S.A. de C.V.  He was also a Director of Stanford International Holdings (Panama), S.A. and Stanford Bank (Panama), S.A.  Nanes was employed by the Stanford entities from 1994 to 2009.  He oversaw the expansion of the Stanford entities into Mexico and South America and was charged with opening up these areas to the sale of Stanford financial products.  Nanes was actively involved in the marketing and sale of the SIB CDs in Mexico and South America and made representations to potential investors that the SIB CDs were insured by Lloyd's of London.

**M.     Laura Pendergest-Holt**

98.     Pendergest-Holt was SFGC's Chief Investment Officer.  She was employed by the Stanford entities from 1997 to 2009.  Pendergest-Holt had additional roles with other Stanford

entities, including: Director of Stanford International Management, Ltd.; Director of Stanford Management Holdings, Ltd.; Director of Stanford Capital Management, LLC; and Director of Stanford Trust Company Administradora de Fonos y Fideicomisos S.A.

99.     Pendergest-Holt facilitated the Stanford Ponzi scheme by misrepresenting to investors that she managed SIB's multi-billion dollar investment portfolio and supervised a sizeable team of investment analysts.  In reality, Pendergest-Holt was involved in managing only a small portion of SIB's investment portfolio.

100.    In 2006 and 2007, Pendergest-Holt trained SIB's Senior Investment Officer ("SIO") to tell investors that SIB's multi-billion dollar portfolio was managed by a "global network of portfolio managers" and "monitored" by a team of analysts in Memphis, Tennessee. In communicating with investors, the SIO followed Pendergest-Holt's instructions, telling investors that SIB's investment portfolio was managed by a global network of money managers and monitored by a team of more than 20 Stanford analysts.

101.    Pendergest-Holt did not disclose to investors that SIB's investment portfolio was segregated into three tiers: (i) cash and cash equivalents ("Tier 1"); (ii) investments managed by money managers and monitored by the Stanford analysts ("Tier 2"); and (iii) undisclosed assets managed by Stanford and Davis ("Tier 3").   As of December 2008, Tier 1 represented approximately 9% of SIB's investment portfolio (approximately $800 million).  Tier 2, prior to a decision to liquidate $250 million of investments in late 2008, represented approximately 10% of SIB's investment portfolio.   And Tier 3 represented approximately 80% of SIB's investment portfolio.

102.    Pendergest-Holt did not disclose to investors that SIB's Tier 3 assets were being "managed" and "monitored" exclusively by Stanford and Davis, not the global network of

money managers or team of Stanford analysts that Pendergest-Holt frequently touted.  In fact, Pendergest-Holt trained the SIO "not to divulge too much" about the oversight of SIB's investment portfolio because such information "wouldn't leave an investor with a lot of confidence."

103.    In early-February 2009, Allen Stanford and Jim Davis participated in meetings with a group of senior Stanford executives in Miami, Florida.  The purpose of the meetings was to prepare Pendergest-Holt and SIB's President for sworn testimony before the SEC.  During these meetings, Stanford and Davis admitted that they had misappropriated investor funds by making the undocumented "loans" to Stanford discussed above.  Four days after the Miami meetings, Pendergest-Holt testified before the SEC regarding SIB's multi-billion dollar investment portfolio.  Pendergest-Holt denied, however, any knowledge concerning the allocation of the vast majority of SIB's assets, even though she knew that more than 80% of SIB's investment portfolio was comprised of speculative and illiquid private equity investments, over-valued real estate, and undocumented "loans" to Allen Stanford.

## N.    Osvaldo Pi

104.    Pi held the title of Managing Director of Merchant Banking for SGC.  He was employed by the Stanford entities from 2001 to 2009.  Pursuant to an advisory agreement between SGC and SIB, SGC was paid a fee to provide consulting services in connection with the management, administration, monitoring, and oversight of certain private equity investments held by SIB.  Pi led these efforts on behalf of SGC.

105.    Pi was aware of the allegations being made regarding the Stanford entities at least as early as July 2008.  After receiving a copy of the Bloomberg Article from the Chairman and CEO of one of the entities in which SIB had invested, Pi forwarded the article to several other high-level Stanford officials.

106.    Pi was aware or should have been aware that the private equity investments held by SIB were inconsistent with the disclosure made by SIB about the nature of its investment portfolio.   Moreover, Pi provided inaccurate and flawed valuations of SIB's private equity investments to Stanford personnel who were responsible for reporting the value of SIB's investment portfolio.

## O.    Nelson Ramirez

107.    Ramirez served as the Managing Director of SFIS from 2005 to 2006 and as Executive Director of SGC's Private Client Group from 2006 to 2007.   He was employed by the Stanford entities from 1999 to 2007.   Ramirez was aware of concerns regarding the SIB CDs as early as May 2005, when he received a notification that the SEC was inquiring into SGC's marketing of the SIB CDs.   Ramirez obtained six-figure commissions for selling SIB CDs and had a duty to investigate the CDs in his capacity as a Stanford insider.

## P.    Glen Rigby

108.    Rigby served as Chief Litigation Counsel for SFGC from 2005 to 2009.   As noted above, Rigby reviewed the 2007 Investor Analysis in February 2007 and was well aware of the questions surrounding SIB and the SIB CDs for several years before the Court appointed the Receiver.

109.    In January 2008, an attorney for Charles Rawl and Mark Tidwell sent a draft petition against SGC to several Stanford attorneys, including Rigby.   In the draft petition, Rawl and Tidwell alleged that "[d]uring the course of their employment [with SGC], [they] became aware of certain illegal practices at Stanford involving the sale of SIBL certificates of deposit and other securities offerings."   In particular, Rawl and Tidwell alleged that SGC purged and destroyed documents with knowledge of an ongoing SEC inquiry into the SIB CD and the CD

sales practices, and knowingly used false historical performance data in selling securities to clients.

110.    In July 2008, Rigby was copied on several e-mails involving high-level Stanford officials discussing the Bloomberg Article.  On July 7, 2008, Rigby forwarded the Bloomberg Article to another Stanford attorney and suggested that Rawl and Tidwell's attorney was "the driving force behind the story and probably solicited the subpoenas from the SEC."

111.    In late-July 2008, Rigby was involved in reviewing drafts of a statement of claim in SGC's FINRA arbitration against Rawl and Tidwell.   That statement of claim, which contained a detailed discussion of the allegations in the Bloomberg Article, asserted that it was Rawl and Tidwell, not SGC, who had disseminated false information concerning SGC's operations.  According to the statement of claim, Rawl and Tidwell caused the SEC inquiry into SGC to cover up their own alleged misdeeds.

112.    In August 2008, Rigby communicated with Alvarado and Bogar regarding the fact that in light of the negative publicity regarding the Stanford entities, SGC's clearing agent wanted "comfort with respect to SIB" and wanted to know "whether there [was] any investigation, whether formal or informal, involving SGC, SIB, or the CD."

**Q.    Jack Staley**

113.    Staley served as the President of Stanford Group (Suisse) AG.  He was employed by the Stanford entities from 2006 to 2009.  Staley was closely involved with the operations of the Stanford entities.   In late 2007 or early 2008, Staley became the regional director for Stanford's Europe operations.  In this capacity, he worked closely with Jim Davis and the other regional directors in developing plans to restructure, reorganize, and consolidate Stanford's operations.  He also worked closely with Davis and with the other regional directors in creating

and coordinating regional and global budgets for the Stanford entities.  Staley also played a key role in facilitating new acquisitions and investments, particularly in Europe and North Africa.

114.    On July 5, 2008, Staley, along with Allen Stanford, Jim Davis, Mauricio Alvarado and others, received from Yolanda Suarez a copy of a Daily Telegraph story reporting that the SEC was investigating Stanford.  On September 23, 2008, Staley e-mailed Davis to tell him that the Stanford financial advisors were "looking for comfort."  Nonetheless, Staley continued to promote the Stanford scheme, including by facilitating the acquisition of Swiss-based independent asset manager—Fortune Wealth Management (FWMG)—in July 2008, and by working in November 2008 to create a coin and bullion fund.

**R.     Linda Wingfield**

115.    Wingfield served as SFGC's Senior VP of the Expense Review Department. She was employed by the Stanford entities from 1998 to 2009.  Wingfield had additional roles with other Stanford entities, including: Director of Stanford International Bank Holdings Ltd.; Director of Stanford Bank Holdings Ltd.; Director of Stanford Trust Holdings Ltd.; Director of Sun Printing Ltd.; Director of The Antiguan Sun Ltd.; President of Two Islands One Club Holdings Ltd.; Director of Idea Advertising Group, Inc.; and President of Stanford Development Corp.

116.    As a result of her position with SFGC, including her detailed knowledge of the flow of funds between and among the various Stanford entities, Wingfield either knew or should have known that Allen Stanford was misappropriating investor funds to fund his lavish lifestyle by diverting those funds through various Stanford entities.

117.    Wingfield also served as President of Two Islands One Club Holdings Ltd., one of the Stanford entities that was involved in Allen Stanford and Jim Davis's plan to effect a series of paper transactions to inflate the value of $63.5 million in real estate purchased by SIB in 2008

by 5,000 percent (to approximately $3.2 billion) during a 4 to 6-month period.  The purpose of this value inflation was to increase the value of the real estate holdings on SIB's balance sheet to achieve a desired level of equity in the business.

**S.      Robert Winter**

118.    Winter was a SIB Director from 1998 to 2008 and served as an insurance broker and risk management advisor for SIB.  As a member of SIB's Board of Directors, Winter knew or should have known that the Hewlitt firm lacked the resources, credentials, reputation, and staff to properly audit a multi-billion dollar investment portfolio.  Winter also knew or should have known of the inadequate documentation of SIB's investment portfolio.

119.    Winter placed coverage for SIB and consulted for SIB on risk management strategy.  Winter knew that SIB's purported insurance coverage was being used improperly to market the SIB CD to potential investors.  Winter sent SIB investors and potential investors thousands of "Safety and Security Letters" misrepresenting the benefits of the insurance policies held by SIB.  These letters improperly suggested that there were insurance policies in place to protect the investors' interests.  Winter stated in these letters that, based on his knowledge, SIB was composed of "first class business people."  The letters described risk management reviews by an outside firm, suggesting that these reviews were material to obtaining the represented coverage.

**T.      Bernie Young**

120.    Young served as Managing Director and Chief Compliance Officer of SGC. He was employed by the Stanford entities from 2006 to 2009.  Young also served as Director of Stanford Capital Management, LLC.

121.    Young was actively involved in SGC's activities related to SIB and the SIB CD. Young was responsible for leading SGC's due diligence efforts with respect to SIB and took

several trips to Antigua to investigate SIB in connection with those efforts.  During these trips, Young reviewed SIB's annual reports, quarterly market recap reports, and the offering documents that SGC used to market SIB CDs to investors.

122.    Young was also responsible for approving marketing materials related to the SIB CD.  In fact, Young helped spearhead SGC's mandatory SIB CD training program.  As part of the program, Young approved a model that authorized Stanford financial advisors to allocate a significant portion of their clients' portfolios to the SIB CD.  Through the program, Young armed Stanford financial advisors with misleading information that he knew would reach Stanford investors, including that SIB was subject to an extensive risk management analysis to determine whether reasonable care was routinely exercised to protect its assets.

123.    Young was one of the recipients of the 2007 Investor Analysis, which essentially concluded that SIB was a Ponzi scheme.  Young had the authority to stop SIB CD sales and, in fact, he did so in February 2009 by issuing the order that stopped the sale of SIB CDs.

**REQUESTED RELIEF**

**COUNT I:     Breach of Fiduciary Duty**

124.    The Defendants were directors and officers of the various Stanford entities. The Defendants each owed a fiduciary duty to place the interest of operating the Stanford entities in a lawful manner above their own interest in being highly-compensated Stanford insiders, to use reasonable care in operating and managing the Stanford entities, and to operate the Stanford entities in a legal and reasonably prudent manner.  Each of the Defendants also owed a fiduciary duty to operate the Stanford entities in compliance with all applicable laws and regulations.

125.    The Defendants breached their fiduciary duties by failing to use reasonable care in operating and managing the Stanford entities, by failing to operate the Stanford entities in a reasonably prudent manner, and by failing to operate the Stanford entities in compliance with all

applicable laws and regulations.  The Defendants ignored the numerous "red flags" discussed above and continued to provide services that furthered the Stanford Ponzi scheme, despite their extensive knowledge of the Stanford entities' fraudulent operations.  By ignoring these red flags, the Defendants allowed the Stanford entities to be dominated, controlled, and exploited by the Stanford Defendants.  The Defendants' grossly negligent acts and omissions demonstrate a want of care and a conscious indifference to the rights, safety, and welfare of the Stanford entities.  The Defendants' grossly negligent acts and omissions also manifest an actual awareness by the Defendants that their conduct posed an extreme degree of risk and likelihood of serious injury to the Stanford entities.  The Defendants' breaches furthered and helped perpetuate the Stanford Ponzi scheme and assisted Allen Stanford in misappropriating at least $1.8 billion in investor funds that were diverted through numerous Stanford entities.

126.    Each of the Stanford entities was controlled by participants in the fraudulent scheme and thus could not sue the directors and officers who were involved in perpetuating the scheme.  Thus, the statute of limitations was tolled until the wrongdoers were removed and the Receiver was appointed.   The SEC filed its action against the Stanford Defendants on February 17, 2009, and the Court appointed the Receiver on the same date.   However, the Receiver did not discover, and could not despite the exercise of reasonable diligence have discovered, until more recently, the Defendants' participation in furthering the Stanford Ponzi scheme.    Moreover, the Defendants' wrongful acts were inherently undiscoverable.    The Receiver also asserts the doctrine of equitable tolling with respect to any applicable statute of limitations.

127.    Because the Defendants breached their fiduciary duties to the Stanford entities, the Defendants are liable to the Receiver for damages, restitution, and disgorgement.

Accordingly, pursuant to the equity powers of this Court, the Receiver seeks an order that: (a) the Defendants breached the fiduciary duties they owed to the Stanford entities; (b) the Defendants are liable to the Receiver for damages, restitution, and disgorgement as a result of those breaches; and (c) the Receiver is entitled to his attorneys' fees, costs, and pre-judgment and post-judgment interest.

### PRAYER

128.    The Receiver respectfully requests that the Court enter Judgment in his favor providing that:

(a)    the Defendants breached the fiduciary duties they owed to the Stanford entities;

(b)    the Defendants are liable to the Receiver for damages, restitution, and disgorgement as a result of their breaches of the duties they owed to the Stanford entities;

(c)    the Receiver is entitled to his attorneys' fees, costs, and pre-judgment and post-judgment interest; and

(d)    the Receiver is entitled to such other and further relief as the Court deems proper under the circumstances.

Dated:  February 15, 2013.                    Respectfully submitted,


                                              **BAKER BOTTS L.L.P.**

                                              By: /s/ Kevin M. Sadler
                                                   Kevin M. Sadler
                                                   Texas Bar No. 17512450
                                                   kevin.sadler@bakerbotts.com
                                                   Scott D. Powers
                                                   Texas Bar No. 24027746
                                                   scott.powers@bakerbotts.com
                                                   David T. Arlington
                                                   Texas Bar No. 00790238
                                                   david.arlington@bakerbotts.com
                                                   1500 San Jacinto Center
                                                   98 San Jacinto Blvd.
                                                   Austin, Texas 78701
                                                   (512) 322-2500
                                                   (512) 322-2501 (Facsimile)


                                              **ATTORNEYS FOR RECEIVER RALPH S. JANVEY**